**Benson WEST, Edward A. Jackson and Michael A. Britt, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 84–287 to 84–289.**

District of Columbia Court of Appeals.
Argued March 26, 1985.
Decided Oct. 21, 1985.

---

Mark S. Carlin, Public Defender Service, Washington, D.C., with whom James Klein, Public Defender Service, Washington, D.C., was on brief, for appellant West.

Diane Kiester Dildine, Washington, D.C., appointed by the court, for appellant Jackson.

Mark A. Gallagher, Law Student Counsel, with whom Susan L. Siegal, Appellate Law Fellow, appointed by the court, and Steven H. Goldblatt, Director, Appellate Litigation Clinical Program, Georgetown University Law Center, Washington, D.C., and Randa J. Trapp, Law Student, were on brief, for appellant Britt.

Wendy Bebie, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Judith Hetherton, and Barry M. Tapp, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and TERRY and ROGERS, Associate Judges.

PRYOR, Chief Judge:

Following a joint jury trial, appellants, Benson West, Edward Jackson, and Michael Britt, were each found guilty of one count of first-degree felony murder while armed (D.C. Code §§ 22-2401, -3202 (1981)), one count of armed robbery (id. §§ 22-2901, -3202), and two counts of attempted robbery while armed (id. §§ 22-2901, -3202). In addition, West was convicted of one count of carrying a pistol without a license (id. § 22-3204).

On appeal, appellants challenge their convictions on a number of grounds. West asserts that the trial court erred in refusing to give a requested lesser-included-offense instruction on manslaughter while armed. Britt and Jackson contend that the trial court erred in denying their motions to sever their cases for trial. They also argue that the government's evidence at trial was insufficient to support their convictions for felony murder. Lastly, Jackson claims that his Sixth Amendment right to confront witnesses was violated when the prosecution was allowed to allude, during cross-examination, to portions of Jackson's codefendants' confessions. Finding no reversible error, we affirm appellants' convictions.

## I. Factual Background

In the early morning hours of January 5, 1983, Michael Scott, Lisa Layton, and Layton's boyfriend, Clayton Brown, drove Scott's mother's truck from Alexandria, Virginia, into the District of Columbia, to the 900 block of Varney Street, S.E. Their purpose in coming into the District was to deliver some furniture for Scott's mother. The events which ensued following their arrival on Varney Street, culminating in the shooting death of Clayton Brown, were the subject of differing accounts by the five eyewitnesses who testified at trial.

The government's evidence at trial included the testimony of four eyewitnesses: the victims, Michael Scott and Lisa Layton, and two bystanders, Maurice Cary and Andre Cary, who are brothers.

Michael Scott testified that when he, Layton, and Brown reached Varney Street, Brown, who was driving, stopped the truck near a group of people congregated around a burning sofa. Scott rolled down his window part way and called out that he wanted to purchase some marijuana. In response to Scott's offer, two men approached the truck holding bags of marijuana. Scott testified that he reached into his pocket and took out five one-dollar bills, and "the next thing [he] knew" one of the men put a gun to Scott's head and announced a robbery. Layton and Scott were ordered out of the truck and searched. Brown remained in the truck. His wallet was searched but he had no money. Scott testified that he heard Lisa Layton crying, and that he heard Brown call out from inside the truck, "you can rob us but leave her alone." One of the robbers warned Brown to be quiet or he would shoot Brown. Notwithstanding the warning, Brown started to get out of the truck and stated, "well, you're going to have to shoot me." Scott and Layton heard a shot and saw Brown "grab his heart." They immediately jumped into the truck and drove away, as the robbers fled the scene.

Scott subsequently identified Jackson and West from a photograph of a lineup, as people who had been present during the robbery and shooting. At trial, however, Scott was unable to specify their exact roles in the events on the night of January 5.

Lisa Layton's testimony to a large degree paralleled Scott's version of the shooting. In addition, she testified that after she got out of the truck, one of the robbers, later identified as Michael Britt, searched her first by feeling her legs and then by putting his hand down her shirt and feeling her chest. When he then "said something about raping [Layton]," she began to cry, causing Brown to come to her

defense. She stated further that West was the individual who shot Brown.[1]

Andre Cary testified that he could not hear words exchanged between appellants and the victims, but did see that West had a gun in his hand when Scott and Layton exited the truck. Maurice Cary testified that he saw Jackson "walking back and forward" on the pavement about six feet or less from the truck and eventually saw Jackson "checking" and "searching" Layton and Scott. Both Cary brothers saw Britt "patting" or holding Layton. They further testified that, immediately before the shooting, they saw Brown get out of the truck, put "something" or a "glove" on his hand, and walk toward West as if he was going to "harm" or "hit" him.[2] Andre saw West raise the gun, but turned away before the shot was fired. When Andre looked back, he saw a man jump into the truck, and saw West holding the gun by his side. Maurice Cary testified that he watched West "pull the trigger."

The government's evidence also showed that, in the hours immediately following the shooting, Detectives Kerwood C. Nixon and Ronald S. Taylor of the Metropolitan Police Department, who were assigned to investigate Brown's death, developed information leading them to appellant West. After being advised of, and waiving, his *Miranda*[3] rights, West confessed in writing to killing Clayton Brown. West claimed that he shot Brown because Brown "made a move like he was going to hit me." West's statement implicated Britt and Jackson in the robbery and shooting, and on January 11, 1983, Britt and Jackson were arrested. Britt also gave a written statement to the police in which he admitted his participation in the robbery.

Neither West nor Britt testified at trial.[4] Jackson did testify on his own behalf. According to his account, the shooting did not arise out of a planned robbery; rather, it was the unplanned outcome of a marijuana sale gone awry.

Jackson claimed that in response to Scott's request for marijuana, he approached the truck with a number of "reefer bags ... reached in and put a bag in the truck." When Scott, who had just paid Jackson five dollars, complained that the bag was too small, Jackson put two more bags of marijuana into the truck. According to Jackson, Scott suddenly rolled up the window on his arm. Because he thought the group in the truck was preparing to drive away without paying for the rest of the marijuana, he called to West, Britt, and Andre Cary, who were standing nearby, and told them "to bust them up" if the truck pulled away. Brown then got out of the truck and walked around the front of it. Jackson claimed that he tried to explain to Brown that he had been "pulling on the truck" because Scott had two bags of marijuana for which Jackson had not been paid.

Jackson testified further that he suddenly saw Andre Cary searching Scott and heard Layton scream. He then watched Brown walk over, grab Britt and tell him to leave Layton alone. Britt pushed Brown, and West threatened Brown, "[I]f you don't leave [Britt] alone I'm going to bust you up." Then Brown began "running toward him with a glove on ... [and] [t]hen a shot went off." Jackson left the scene and went home.

Jackson denied planning or intending to rob anyone on the night of the shooting. Rather, he claimed that when he went to

1. Layton attended a lineup on January 24, 1983, at which she identified Britt and West as two of the assailants. She also identified Britt and West in court.

2. Both Cary brothers can fairly be characterized as reluctant witnesses. Maurice and Andre testified that they had known appellants for years, and that Jackson lived downstairs from the Cary family. In addition, Maurice Cary testi-

fied that Britt was "[j]ust like family," and that if he (Maurice) "didn't have a subpoena [he] wouldn't be [in court]."

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Britt presented no evidence; West presented two character witnesses.

Varney Street that evening, his only intention was to sell "the reefer that [he] had."

## II. *Lesser-Included-Offense Instruction*

We first address West's sole contention on appeal: that the trial court erred in refusing a requested lesser-included-offense instruction on manslaughter. West argues that such an instruction was appropriate because the jury could have concluded that West shot Brown after the robbery was completed, and in response to what West perceived was an armed assault by Brown. The trial court rejected the request for a manslaughter instruction and, instead, instructed the jury *inter alia* on the elements of first-degree felony murder and second-degree murder because the court did not believe a manslaughter instruction was "consistent with the evidence." We agree with this conclusion.

■ A defendant is entitled to a lesser-included-offense instruction when (1) all elements of the lesser offense are included within the offense charged, and (2) there is a sufficient evidentiary basis for the lesser charge. *Sansone v. United States*, 380 U.S. 343, 349–50, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965); *Day v. United States*, 390 A.2d 957, 961 (D.C.1978), *overruled on other grounds*, 490 A.2d 1086 (D.C.1984).

With respect to the first element of this test, the government maintains that this court has never explicitly recognized voluntary manslaughter to be a lesser-included-offense of first-degree felony murder. For purposes of this case, however, we need not decide whether manslaughter is a lesser-included-offense of first-degree felony murder because we conclude that there was not sufficient evidence to warrant such an instruction.

■ Voluntary manslaughter is the unlawful or unexcused killing of a human being without malice. *Morgan v. United States*, 363 A.2d 999, 1002 (D.C.1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2187, 53 L.Ed.2d 231 (1977); Criminal Jury Instruc-

tions for the District of Columbia, No. 4.25 (3d ed.1978). Thus, a defendant is entitled to a manslaughter instruction where there is some evidence showing "adequate provocation by the victim causing the defendant to strike out in the sudden heat of passion." *Morgan v. United States, supra*, 363 A.2d at 1002. We have previously defined "adequate provocation" as that which "might naturally induce a reasonable person in the passion of the moment to lose self-control and commit the act on impulse and without reflection." *Hurt v. United States*, 337 A.2d 215, 218 (D.C.1975) (quoting Criminal Jury Instructions, *supra*, No. 4.25); *see Dean v. United States*, 377 A.2d 423, 427 (D.C.1977).

■ In the instant case, there was not even minimal evidence showing adequate provocation or the absence of malice. Significantly, it was undisputed at trial that West was armed with a deadly weapon when he approached the truck. This suggests the presence and not the absence of malice. *See Curry v. United States*, 322 A.2d 268, 269 (D.C.1974). In contrast, all the witnesses agreed that Brown did not carry a weapon. Moreover, even accepting Jackson's version of the events leading up to the shooting as true, Brown's act of "walking towards" West, *unarmed*, while they exchanged words, is not the sort of "provocative" act "which would cause a reasonable person to lose control and act ... without reflection." *Dean v. United States, supra*, 377 A.2d at 427. There was no evidence that Brown ever got close enough to West to even strike West. Nor do we believe that the mere act of putting on a glove can be viewed as the kind of threatening act that would incite a reasonable person to shoot with a deadly weapon. It is well established that a "trivial or slight provocation entirely disproportionate to the violence of the retaliation, is not adequate provocation." *Nicholson v. United States*, 368 A.2d 561, 565 (D.C. 1977).

Similarly, even if Brown's statement "you're going to have to shoot me" can be

construed as a responsive threat to West, it is well settled that "[m]ere words standing alone, no matter how insulting, offensive, or abusive, are not adequate provocation." *Id.* at 565 (quoting *Hurt v. United States, supra,* 337 A.2d at 218). In addition, West's verbal threat to Brown, "I'm going to bust you up," preceded any physical confrontation between the two men. West's behavior in this regard negates the assertion that Brown provoked West into shooting.

■ Finally, there is no merit to West's contention that the robbery was already "complete" when the shooting took place. Both Layton and Scott testified that the entire incident lasted less than fifteen minutes. There was considerable evidence that the actions beginning with the robbery and ending with the shooting were part of a continuous chain of events. *See Murchison v. United States,* 486 A.2d 77, 81 (D.C. 1984). As such, the robbery was not over until both the victims and the perpetrators fled the scene. *See Coleman v. United States,* 111 U.S.App.D.C. 210, 219, 295 F.2d 555, 564 (1961), *cert. denied,* 369 U.S. 813 (1962).

In sum, in the absence of any evidence to support West's contention that he was adequately provoked into shooting his victim, the presence of a manslaughter instruction would have encouraged the jury to undertake an unwise and impermissible "bizarre reconstruction" of the evidence. *Wood v. United States,* 472 A.2d 408, 410 (D.C. 1984). Thus, the trial court did not err in ruling that there was no rational basis in the evidence to justify the requested manslaughter instruction.

### III. *Sufficiency of the Evidence*

Both Britt and Jackson maintain that the evidence adduced at trial was insufficient to support their convictions as aiders and abettors in the felony murder of Brown. We disagree. Upon reviewing the evidence in the light most favorable to the government, *Hall v. United States,* 454 A.2d 314, 317 (D.C.1982), we conclude that a jury could reasonably have found that Britt and Jackson were integral to the commission of the armed robbery and to the killing of Brown. *See Hack v. United States,* 445 A.2d 634, 639 (D.C.1982) (reversal on grounds of insufficiency is appropriate only "if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt").

■ One who aids and abets another in committing a criminal offense is chargeable as a principal for all acts committed " 'in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended.' " *Christian v. United States,* 394 A.2d 1, 48 (D.C. 1978) (citations omitted), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). The oft-recited elements of aiding and abetting are: (1) that the offense was committed by someone, (2) that the accused participated in the commission, and (3) that he did so with guilty knowledge. *Byrd v. United States,* 364 A.2d 1215, 1219 (D.C. 1976); *Blango v. United States,* 335 A.2d 230, 235 (D.C.1975). Here, all three elements were proven.

Britt does not dispute his joint participation in the commission of the armed robbery. Rather, he argues that the government failed to introduce evidence showing that West's shooting of Brown was connected in any way to the attempted robbery of Brown. Absent such evidence, he contends, his conviction for felony murder, predicated on the attempted armed robbery, cannot stand. This contention is unpersuasive, however, for the reasons stated above, *i.e.,* there is no basis for the argument that the robbery was "completed" before the homicide occurred.

Where the predicate felony is attempted armed robbery, first-degree felony murder requires that (1) the defendant inflict an injury on the deceased for which the deceased died, and (2) the defendant do so while perpetrating or attempting to perpetrate a specified felony while armed. *See*

*Head v. United States,* 451 A.2d 615, 625 (D.C.1982); Criminal Jury Instructions, *supra,* No. 4.22 (A). Once these requisite elements are shown, "[n]o distinction [is] made between principals and aiders and abettors for purposes of felony murder liability." *Waller v. United States,* 389 A.2d 801, 807 (D.C.1978), *cert. denied,* 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980). Rather, all accomplices are culpable for the resulting death. This is so even if the killing is unintentional since only intent to commit the underlying felony must be proved. *See Christian v. United States, supra,* 394 A.2d at 48; *Waller v. United States, supra,* 389 A.2d at 807.

In the instant case, the felony murder charge was predicated on the attempted armed robbery of Brown. Britt's participation in the robbery is well documented in the record. He stood by as West placed the gun to Scott's head and announced a robbery. He then "checked" Layton for money. It was his whispered suggestion of a sexual assault that caused Layton to begin crying, prompting Brown to get out of the truck and confront the robbers. Indeed, the jury might well have concluded that Britt's actions while perpetrating the robbery exacerbated the situation and escalated the robbery into a homicide.

■ Moreover, as outlined above, the evidence showed that the attempted robbery of Brown and Layton, the robbery of Scott, and the shooting of Brown were all part of one continuous chain of events. Appellants approached the victims as a group. Britt searched Layton and Scott for money at the same time that West went through Brown's empty wallet. The victims and their assailants stood within a few feet of each other throughout the incident.[5] As Layton was being searched for money, Brown got out of the truck and attempted to stop Britt from harming her. It was at this point that West shot Brown. In light of this evidence, appellant's character-

ization of the robbery as separate and distinct from the shooting is totally artificial. A jury could reasonably have concluded that there existed a joint scheme to rob the truck's occupants, including Brown, and that the fatal shot, which was fired within minutes after the robbery had commenced, was a natural and probable consequence of the attempted robbery, and not merely coincidental in time and place to the robbery. *See Long v. United States,* 364 A.2d 1174, 1177 (D.C.1976).

■ While the government's evidence concerning Jackson's specific role in the events leading to the killing of Brown was less than that introduced against Britt, there was, nevertheless, sufficient evidence to create a jury question as to Jackson's role as an aider and abettor.

The thrust of Jackson's position is that although the evidence showed his admitted involvement in an uncharged offense, distribution of marijuana, it failed to establish anything other than mere presence with respect to the armed robbery and the resulting homicide. While it is settled that mere presence at the scene of a crime is insufficient without more to prove criminal conduct, presence will constitute aiding and abetting if it encourages the perpetrator or otherwise facilitates the crime. *Glass v. United States,* 395 A.2d 796, 806 (D.C. 1978); *Creek v. United States,* 324 A.2d 688, 689 (D.C.1974). In the instant case, Jackson's claim that he was only an innocent bystander to the robbery and subsequent killing is belied by his own testimony as well as the testimony of the other eyewitnesses.

According to Jackson's own account of the incident, after approaching the vehicle, he initiated the confrontation by calling the other men over to the truck to "bust it up" if Brown and his companions tried to drive away. Maurice Cary testified that he saw Jackson pacing back and forth within a few

---

**5.** Significantly, in his testimony, Andre Cary described the robbers as standing in a circle sur-

rounding the truck and the victims.

feet of the victims as the victims were being searched. Jackson's behavior in such close proximity to the others, and his clear association with them, surely worked to intimidate the victims even more than if he had not been present. More importantly, Andre Cary testified that he saw Jackson actually push Layton and Scott up against the truck and proceed to check or search them. In light of this evidence, the jury could reasonably have found that Jackson was not a neutral force in the events but, rather, that his conduct was designed to encourage and facilitate the commission of the armed robbery which resulted in the homicide.

Thus, we conclude that the government presented sufficient evidence concerning the conduct of Britt and Jackson from which a jury making reasonable inferences could find, beyond a reasonable doubt, that Britt and Jackson aided and abetted the commission of the felony murder.

### IV. *Severance*

Britt and Jackson also assign as error the trial court's denial of their pretrial motions to sever the cases against each of the three defendants for trial.

When two or more persons are charged with jointly committing a criminal offense, a "strong presumption" arises that they will be tried together. *Jennings v. United States,* 431 A.2d 552, 556 (D.C.1981), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982). "Joinder serves to expedite the administration of justice, reduce congestion of trial dockets, conserve judicial time, lessen the burden upon citizens who serve as jurors, and avoid the necessity of recalling witnesses...." *Id.* at 556. The decision whether to grant a motion to sever rests within the discretion of the trial court and will be reversed on appeal only upon a showing of an abuse of that discretion. *Sweet v. United States,* 438 A.2d 447, 450 (D.C.1981); *Hilton v. United States,* 435 A.2d 383, 389 (D.C.

1981). Moreover, to justify reversal "an abuse of discretion must violate a defendant's right to due process and a fair trial." *Sweet v. United States, supra,* 438 A.2d at 451.

Britt and Jackson claim that they were prejudiced as a result of the joinder of their cases at trial because (1) they presented conflicting and irreconcilable defenses; and (2) redaction of the confession of codefendant West (and in the case of Jackson, the redaction of the confession of Britt as well) was not feasible, and therefore, the use of the confessions at trial violated the proscription set out by the Supreme Court in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Britt also argues that severance was necessary in his case because the evidence against him at trial was *de minimis* as compared to the evidence against Jackson and West.[6] We examine these contentions seriatim.

First, appellants maintain that severance of their trials was necessitated by the conflicting and irreconcilable nature of their defenses. We are not persuaded.

Without more, the mere fact that codefendants rely upon conflicting defenses does not mandate severance. *Sweet v. United States, supra,* 438 A.2d at 451. Rather, "the irreconcilability must be of such a nature that the jury will draw the improper conclusion from the conflict alone that both are guilty." *Id.* (emphasis in original); *see Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966). Decisions which have addressed this issue have emphasized that where there is "independent evidence of each defendant's guilt supporting the jury verdict, the conflict does not necessarily prejudice the defendant" so as to require reversal. *United States v. Leonard,* 161 U.S.App. D.C. 36, 47–48, 494 F.2d 955, 966–67 (1974); *see Hamilton v. United States,* 395 A.2d 24, 28 (D.C.1978).

---

**6.** Although the government maintains that appellants have not properly preserved these arguments for appeal, we are satisfied that they have been preserved.

We are hard pressed to see how the defenses of Britt and Jackson were significantly conflicting or irreconcilable with each other or with codefendant West's defense. Indeed, their respective defenses paralleled each other in a number of ways. As the main thrust of their defenses, both Britt and Jackson denied that robbery was their motivation in their confrontation with the victims. Britt contended that he was interested mainly in making a sexual advance at Layton, while Jackson claimed his sole intention was to sell his "reefer." Similarly, both Jackson and West maintained that the shooting occurred as a result of the alleged attempt by the victims to steal Jackson's marijuana.

Moreover, even though appellants' individual accounts of the events in question were not identical in every detail, we are not persuaded that separate trials were required. Any conflicts in their defenses were not significant in light of the substantial independent evidence of appellants' guilt which was provided by the victims' eyewitness accounts at trial. Accordingly, the trial court did not abuse its discretion in refusing to grant appellants' severance motions on the ground of irreconcilable defenses.

Second, we do not find that the use of their codefendants' confessions at trial prejudiced appellants so as to make the failure to sever the three cases reversible error.

In *Bruton v. United States*, the Supreme Court held that it was a violation of a defendant's Sixth Amendment right to confront the witnesses against him to allow into evidence, at a joint trial, an extrajudicial statement of a nontestifying codefendant which implicates the defendant. 391 U.S. at 124, 88 S.Ct. at 1621. However, before a motion to sever is granted on *Bruton* grounds, the trial court should first consider whether redaction, *i.e.*, editing the statement to delete references to the non-confessing defendant, is feasible. *Carpenter v. United States*, 430 A.2d 496, 501 (D.C.) (en banc), *cert. denied*, 454 U.S.

852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). "[W]here redaction is feasible, severance may properly be denied." *Id.* at 505.

In the instant case, the confessions of Britt and West were redacted prior to trial to delete any references to the names of the respective codefendants. In place of names, the neutral terms, "someone" or "somebody" were inserted, and "we" was changed to "I." Thus, when the confessions were read to the jury, no mention of the codefendants was made. Nor could the jury likely discern from the neutral references a suggestion to any one of the codefendants in particular. The use of the neutral terms was effective because the evidence established, prior to the introduction of the statements, that at least five people were present at the scene of the robbery and shooting, in addition to the victims. Additionally, the confessions prior to redaction were oblique with respect to the individual roles of each person present at the scene. Lastly, the trial court explicitly instructed the jury that a confession

> constitutes evidence only against the defendant making it. It is not evidence against any other defendant. You must not consider it in any way in determining the guilt or innocence or credibility of any other defendant.

Under these circumstances, we conclude that any potential prejudice to the appellants from the introduction of the statements was averted by the redaction. *See id.* at 505.

Britt's contention that joinder was improper, because of the disparity in the quantity and character of the evidence against him as compared to his codefendants, is similarly without merit. This court has previously stated that "[a] defendant is not entitled to severance merely because the evidence against a codefendant is more damaging than the evidence against him." *Christian v. United States, supra,* 394 A.2d at 21. Rather, substantial prejudice arises "only where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to

the evidence against his codefendants." *Id.* at 21; *see Sweet v. United States, supra,* 438 A.2d at 451.

Upon reviewing the evidence introduced against Britt, we cannot even say it was measurably less persuasive than the evidence against his codefendants, much less that it fell below the *de minimis* level. While the evidence against West was more substantial in that it was West who pulled the trigger, that fact by itself did not require severance. To find otherwise would require severance in almost all multi-defendant felony murder cases. Moreover, the trial court further minimized any risk of prejudice by instructing the jury to consider the evidence against each defendant separately. *See Sweet v. United States, supra,* 438 A.2d at 453.

In sum, we find no abuse of discretion in the trial judge's decision to permit these cases to be tried jointly.

## V. *Sixth Amendment Right to Confrontation*

During the prosecutor's cross-examination of Jackson, the following exchange took place:

Q. You heard Benson West—Mr. West's statement read in court ... saying there was a fire out there?

A. Yes.

\* \* \* \* \* \*

Q. And you heard Mr. Britt's statement saying there was a fire out there?

A. Yes.

\* \* \* \* \* \*

Q. And you were with them, is that right, at some point in time you were all together?

A. Yes.

Q. And you didn't see a fire?

A. No, sir.

Similarly, at another point in the same cross-examination the prosecutor initiated the following exchange:

Q. And you heard ... Mr. West's statement when he said that Mr. Brown never got out of the truck ... you heard that, didn't you?

\* \* \* \* \* \*

A. Yes.

Q. That was wrong, his statement—he was wrong?

\* \* \* \* \* \*

Q. No, I'm just asking you about Mr. West's statement. Did you hear the statement when he said—

A. Yes.

Q. So he was wrong in the statement when he said—

A. I'm not saying—I'm not going to say he was wrong.

Q. But your recollection is different from his, is that what you are telling us?

A. Yes.

Later on in his cross-examination of Jackson, the prosecutor made further references to West's confession in a continuing effort to highlight the inconsistencies between Jackson's testimony and the statements of his codefendants. The prosecutor also asked Jackson a series of questions which required Jackson to comment on the veracity of previous witnesses.[7]

Jackson's attorney did not object to this line of questioning during trial. Jackson now argues on appeal that the trial court denied him the right to confront witnesses in violation of the Sixth Amendment by allowing the prosecutor to refer to portions of his non-testifying codefendants' statements during cross-examination. *See Bru-*

---

**7.** In several opinions rendered subsequent to the trial in the instant case, this court has held that questions on cross-examination aimed at eliciting responses by the witness that he is telling the truth and that the contrary witnesses are lying are inappropriate. *See, e.g., Freeman v. United States,* 495 A.2d 1183, 1186–87 (D.C. 1985); *Sherrod v. United States,* 478 A.2d 644, 653 n. 8 (D.C.1984); *Green v. United States,* 481 A.2d 1310, 1311 (D.C.1984); *Carter v. United States,* 475 A.2d 1118, 1126 (D.C.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985). This is because "one witness may not express a view or an opinion on the ultimate credibility of another witness' testimony." *Id.*

*ton v. United States, supra,* 391 U.S. at 126–27, 88 S.Ct. at 1622–23. Because Jackson failed to make a timely objection to the cross-examination, we review his claim under a plain error standard. *Williamson v. United States,* 445 A.2d 975, 980 (D.C. 1982).

 The prosecutor's references to the redacted confessions of West and Britt were introduced with the intention of impeaching Jackson's credibility. Thus, the statements were not introduced to prove the truth of their content. What was significant was how Jackson's testimony compared with that of his accomplices. As such, the situation presented here is distinguishable from the situation in *Bruton.*[8] *See Bowden v. Francis,* 733 F.2d 740, 756–57 (11th Cir.1984), *vacated on other grounds,* — U.S. ——, 105 S.Ct. 1834, 85 L.Ed.2d 135 (1985).

Notwithstanding this distinction, given the prophylactic underpinnings of *Bruton,* we believe that by introducing portions of Britt's and West's statements into evidence, in the form of questions put to Jackson on cross-examination, the prosecutor acted improperly. *See Bowden v. Francis, supra,* 733 F.2d at 757. We do not find, however, that this questioning was "so clearly prejudicial to [Jackson's] substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc) (setting out standard of reversal under plain error review). As previously stated, the evidence of Jackson's guilt was strong. At no point during the cross-examination of Jackson did the prosecutor argue or suggest that the redacted confessions demonstrated Jackson's complicity as one of the robbers. In addition, Jackson's credibility was successfully attacked in other ways. For example, he was impeached with his own prior inconsistent statement and a prior conviction. Lastly, the trial court instructed the jury not only that the

statements could not be used as substantive evidence, but also that they could not be used to determine the "credibility of any other defendants." In this context, we do not believe this improper line of questioning rises to the level of plain error, but rather is "harmless error beyond a reasonable doubt." *See Smith v. United States,* 312 A.2d 781, 787–88 (D.C.1973); *United States v. Jarrad,* 754 F.2d 1451, 1457 (9th Cir.1985).

In conclusion, we find no basis for reversing appellants' convictions. Accordingly, they are

*Affirmed.*

---

**8.** In *Bruton,* at a joint trial of the petitioner and his accomplice, the prosecutor introduced the accomplice's unredacted confession into evidence through the testimony of a postal official. The confession, as read to the jury, explicitly incriminated the petitioner.